**SELECT CREATIONS, INC., a Wisconsin corporation, Plaintiff,**

v.

**PALIAFITO AMERICA, INC., an Illinois corporation, Defendant, Counterplaintiff and Third–Party Plaintiff,**

v.

**Miryoung (or "Mi Ryoung") LEE a/k/a "Joy Lee" "Melody Lee", "Miryoung Song", "Miryoung Deering", "Miryoung Deering Song" and "Miryoung Melody Lee", an alien (No. A 36510736), Jong Sik (a/k/a "Jerry") Lee, an alien, Mantae Company Limited, a Korean corporation, Many Amazing Ideas, Inc. f/k/a "Mantae America, Inc.", a New York corporation, Mai Ltd., a Korean corporation, Puff Pac Production, Ltd., a Korean corporation, Best International Corp., a Korean corporation, Chusik Hosea Kyongyong a/k/a "Marue Joint Stock Trading Company" d/b/a "Best General Merchandise Corp." and "Best General Merchandise (USA)", a Korean corporation, Grip Toys, Inc., f/k/a "Mai, Ltd.", a Nevada corporation, Bertrand A. Levesque, a California citizen, Keith D. Nowak, a New Jersey Citizen, Lieberman, Rudolph & Nowak, a New York partnership, Samuel Petrovich, a Wisconsin citizen, Thomas Meisenheimer, a Wisconsin citizen, Paul Moss, a Minnesota citizen, Paul Moss & Co., Inc., a Minnesota corporation, Robert C. Hooper, a California citizen, Steven Composto, a New York citizen, Forman Marketing & Sales Corp., a New York Corporation, Keith Andes, individually**

and d/b/a Andes and Co., a Tennessee citizen, Andes America, Inc., a Tennessee corporation, Dayton Hudson Corporation, d/b/a "Target Stores", a Minnesota corporation, and John Does I–XX, non-Illinois citizens, Third–Party Defendants

and

Select Creations, Inc., a Wisconsin corporation, Counterdefendant.

No. 91–C–1240.

United States District Court, E.D. Wisconsin.

Dec. 18, 1995.

1134

**1136**

David Springer and John Lyons, Skadden, Arps, Slate, Meagher & Flom, Chicago, Illinois, for plaintiff.

Herbert Monte Levy, New York City, for defendants.

## DECISION AND ORDER

WARREN, District Judge.

Now before the Court are the cross-motions for summary judgment filed by defendant and third-party plaintiff Paliafito America Inc. (Paliafito) and third-party defendants Stephen Composto (Composto) and Forman Marketing & Sales Corp. (Forman) (collectively "the Forman defendants") in the above-captioned action. In this small piece of the much larger Paliafito litigation, the plaintiff has asserted claims against the Forman defendants for breaching their fiduciary duties to Paliafito and for tortiously interfering with Paliafito's contractual and prospective economic relationship with Toys R Us. The Forman defendants have asserted a counterclaim against Paliafito for allegedly unpaid commissions.

The cross-motions for summary judgment relate to each of these claims. For the following reasons, Paliafito's motion for partial summary judgment declaring the Forman defendants liable for breaching their fiduciary duties will be granted, its motion for partial summary judgment declaring the de-

fendants liable for tortiously interfering with Paliafito's current and prospective economic relations will be granted in part, and its motion for summary judgment dismissing the Forman defendants counterclaim will be granted. Correspondingly, the defendants' motion for summary judgment dismissing all claims against it and declaring Paliafito liable for commissions allegedly owed will be denied. The Court's findings of fact and conclusions of law follow.

## I. *FINDINGS OF FACT*[1]

### A. PARTIES AND RELATED NONPARTIES.

■ 1. Paliafito is an Illinois corporation with its principal place of business in Illinois. Paliafito was in the business of marketing and distributing the Grip Ball game, and is owned by Mark and John Paliafito and Mike Barker. *See* Paliafito's Second Amended Counterclaim and Third–Party Complaint ("2nd Am.Ctcl.") ¶ 4; Answer of Counterdefendants Steven Composto and Forman Marketing & Sales Corp. ("Composto Ans.") ¶ 5.

2. Counterdefendant Stephen Composto is a citizen and resident of the State of New York. He is president of counterdefendant Forman Marketing & Sales Corp., a New York corporation. *See* 2nd Am.Ctcl. ¶¶ 19, 20; Composto Ans. ¶¶ 9, 10.

3. Judgment debtor and former counter-defendant Miryoung ("Joy") Lee was, at all relevant times, a Korean national with residences in or near Seoul, Republic of Korea, California, and New York. At all relevant times, Joy Lee was president of Many Amazing Ideas, Inc. ("MAI") and Grip Toys and the sole director and shareholder of MAI. *See* 2nd Am.Ctcl. ¶ 5; Composto Ans. ¶ 1. On August 13, 1993, the Court entered judgment against Joy Lee, and in favor of Paliafito, in the amount of $8 million on Paliafito's claims contained in its Second Amended

**1.** We note that the Forman defendants' factual pleadings fail to satisfy the basic requirements of Federal Rule 56. The defendants have submitted eighty-two (82) proposed findings of fact without a single cite to the evidentiary record. Moreover, their objections to Paliafito's proposed findings of fact consist largely of pure argument, more often than not lacking evidentiary support. The affidavits the defendants do cite (both affida-

vits of Stephen Composto) respond directly to Paliafito's proposed findings and in many cases are not based on the personal knowledge of the affiant. *See First Commodity Traders Inc. v. Heinold Commodities Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985) ("Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact.") (citation omitted).

Counterclaim and Third–Party Complaint. *See Select Creations, Inc. v. Paliafito America, Inc.,* 830 F.Supp. 1223, 1240–41 (E.D.Wis.1993) (*"Select II"*).

4. Former counterdefendant Many Amazing Ideas, Inc. ("MAI") was a New York corporation with its principal place of business in California. On February 22, 1993, Joy Lee caused MAI to file a chapter 11 petition commencing the proceeding *In re Many Amazing Ideas, Inc.,* LA93 15924 (Bankr.C.D.Cal.) (Greenwald, J.) to avoid enforcement of the Court's Writ of Attachment, Preliminary Injunction, and Appointment of a Receiver requiring MAI to deposit $8 million with a court-appointed receiver. *See Select II,* 830 F.Supp. at 1232. On December 8, 1993, the Bankruptcy Court, at the request of Paliafito, converted the case to chapter 7. Pursuant to a Settlement Agreement approved by the Bankruptcy Court, the Court dismissed MAI from this action. In its Order Approving the Settlement Agreement, the Bankruptcy Court granted to Paliafito a $10 million unsecured claim, a $500,000 chapter 11 administrative claim, and other consideration.

5. Former counterdefendant Select Creations, Inc. ("Select") is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin. *See* 2nd Am.Ctcl. ¶ 11; Composto Ans. ¶ 7. Former counterdefendant Samuel Petrovich is a citizen and resident of Wisconsin and president and sole stockholder of Select. *See* 2nd Am.Ctcl. ¶ 12; Composto Ans. ¶ 8. Former counterdefendant Thomas Meisenheimer is a citizen and resident of Wisconsin and, at all relevant times, was a vice president of Select. *See* 2nd Am.Ctcl. ¶ 13; Composto Ans. ¶ 1. Former counterdefendant Robert C. Hooper ("Hooper") is a citizen and resident of the State of California and, at all relevant times, was the executive vice president of Select. *See* 2nd Am.Ctcl. ¶ 14; Composto Ans. ¶ 1. Former counterdefendant John Burke ("Burke") is a citizen and resident of the State of California and, at all relevant times, was a vice president of Select. *See* 2nd Am.Ctcl. ¶ 15; Composto Ans. ¶ 1.

6. Robert H. Storm ("Storm") is a citizen and resident of the State of Wisconsin, is an attorney admitted to practice in Wisconsin, and is a member of the Wisconsin law firm Canellos & Storm, S.C. At all pertinent times, Storm and Canellos & Storm have acted as agents for Select, Petrovich, Meisenheimer, Hooper, and Burke. *See* 2nd Am. Ctcl. ¶ 16; Composto Ans. ¶ 1.

**B. JURISDICTION AND VENUE.**

7. The amount in controversy in the Counterclaim exceeds the sum or value of $50,000, exclusive of interest or costs. *See* 2nd Am.Ctcl. ¶ 26.

8. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1), by reason of the complete diversity of citizenship between Paliafito and the counterdefendants, and also under 28 U.S.C. § 1367 (supplemental jurisdiction). *See* 2nd Am.Ctcl. ¶ 27; Composto Ans. ¶ 1.

9. This Court has personal jurisdiction over Composto and Forman because the undisputed facts set forth herein establish that they, individually, and through their agents, committed acts within Wisconsin that gave rise to injury to Paliafito's property. Wis. Stat. § 801.05(3).

10. The undisputed facts set forth herein establish that venue is proper over this Counterclaim in the Eastern District of Wisconsin because a substantial part of the events giving rise to the Counterclaim occurred in this District (28 U.S.C. § 1391(a)(2)), and because Forman and Composto are subject to personal jurisdiction in this District (28 U.S.C. § 1391(a)(3)).

**C. MARKETING AND DISTRIBUTION OF GRIP BALL.**

11. In 1990, Forman and Select entered into a "Representative Agreement." Declaration of Susan Jacobson ("Jacobson Dec."), Exhibit 1. In it, Select granted to Forman a territory in the eastern part of the United States and stated that Forman would be paid a 10% commission for all sales within the territory. Select and Forman also agreed not to disclose to any person or entity confidential information furnished by either party.

12. On February 15, 1991, MAI and MCL, on the one hand, and WAAC (prede-

cessor in interest to Paliafito) on the other hand, entered into the exclusive distributorship contract (the "Exclusive Distribution Agreement"). *See Select Creations, Inc. v. Paliafito America, Inc.*, 828 F.Supp. 1301, 1319 (E.D.Wis.1992) ("*Select I* ") (finding of fact ¶ 203) (citing DX 11A)).

13. The Exclusive Distribution Agreement provided that MAI would grant Paliafito the exclusive right to distribute Grip Ball products in the United States subject to certain conditions. *Id.* (finding of fact ¶ 207) (citing DX 11A).

14. In exchange for the grant of these exclusive rights, the Exclusive Distribution Agreement required Paliafito to pay MAI $1,000,000, payments for which were to be made in four installments, the first due on signing, the second on March 1, 1991, the third on May 1, 1991 and the final payment on July 1, 1991. *Id.* (finding of fact ¶ 217) (citing DX 11A, ¶ 2.) Paliafito made these payments in accordance with the terms of the agreement.

15. Paliafito was also required to expend $00.70 per game on advertising, (DX 11A, ¶ 12.2), to "cooperate and consult" with MAI in all advertising and to give MAI the right to approve all such advertising. *Id.* (finding of fact ¶ 215) (citing DX 11A, ¶ 12.3.)

16. After Paliafito signed a letter of intent to enter into the Exclusive Distribution Agreement, Paliafito retained Select and its representatives, including Forman and Composto, to act as Paliafito's "mass merchandising consultant in order to promote the sales of the [Grip Ball game.]" *See* DX 65; FRPFF § 30.

17. In mid-February 1991, Paliafito held a sales meeting at Forman's showroom in New York. At this meeting, Scott Hupe of Paliafito announced to Composto and other Select representatives that Paliafito had signed a letter of intent to purchase the exclusive rights to Grip Ball. Hupe discussed sales strategies with the representatives. *See* Declaration of Scott Hupe ("Hupe Dec.") ¶¶ 4–5.

18. The next day, Composto told Hupe that Paliafito should package the Grip Ball in clam shell. Composto told Hupe that it would be critical to package the game, which he termed "your product," in this fashion in order to sell the game to mass market retailers he intended to approach, specifically, Toys R Us. *Id.* ¶ 6.

19. Effective February 15, 1991, and later memorialized on April 11, 1991, Select and Paliafito entered into a mass marketing consultant agreement (the "Select/Paliafito Agreement"). *See Select I*, 828 F.Supp. at 1333 (finding of fact ¶ 367) (citing DX 65).

20. The Select/Paliafito Agreement contained the following express grant of rights.

Paliafito hereby employs Select as its sole and exclusive mass merchandising consultant to develop and carry out a trade advertising program for "Super Grip Ball," the purpose of which shall be to obtain mass merchandising orders for "Super Grip Ball." Select is authorized to enter into contracts with third parties to carry out the purpose of this Agreement; provided, however, that such contracts are subject to the prior written approval of Paliafito.

*See* DX 65 ¶ 1.

21. Paliafito and Select recognized that Select, pursuant to the Select/Paliafito Agreement, acted as Paliafito's agent with respect to the sale of Grip Ball to the mass market. In an affidavit submitted to the New York Supreme Court, Petrovich, Select's president, testified that "Select's duties under its Agreement with [Paliafito] was to be the marketing agent for the mass market." *See Select I*, 828 F.Supp. at 1334 (finding of fact ¶ 371) (citing DX 66 ¶ 3).

22. Pursuant to this agreement, Select agreed to forward "all orders received by Select, its agents and/or reps' ... to Paliafito," (DX 65 ¶ 3(D)), to "act as the mass marketing consultant and perform [certain services] to the extent necessary to meet Paliafito's needs," (DX 65 ¶ 2), and warranted that "it shall not enter into any contract with any party regarding the sales, promotion or advertising of [the game] without the prior written consent of Paliafito." (DX 65 ¶ 9(3)). *Id.* at 1334 (finding of fact ¶ 361).

23. The Select/Paliafito Agreement also provided that Select, to the extent necessary

to meet Paliafito's needs, would "contract with sales representatives, subject to the approval of Paliafito, to sell and promote Super Grip Ball in the mass market defined in the exhibit hereto." *See Select I,* 828 F.Supp. at 1334 (finding of fact ¶ 368) (citing DX 65 ¶ 2(B)).

24. The agreement between Forman and Select to sell Grip Ball products was made pursuant to this provision of the Select/Paliafito Agreement, and pursuant to the authority conferred upon Select by that agreement. *See* Brief of Counterdefendants Forman Marketing and Stephen J. Composto in Support of their Motions to Dismiss the Complaint of Paliafito and for Affirmative Relief Against Paliafito in the amount of $213,801.69 ("Composto Brief") at 6 (Forman and Composto's Proposed Findings of Fact ("Composto Findings") ¶ 9).

25. All of the orders that Forman and Composto procured on behalf of Paliafito, and for which Forman now seeks commissions from Paliafito, were obtained pursuant to the Select/Paliafito Agreement. *See* Declaration of Mark C. Paliafito ("Paliafito Dec.") ¶ 3.

26. Under the Select/Paliafito Agreement, Select and its representatives agreed to procure orders in the toy industry's mass market for Paliafito for the game in exchange for a five percent commission payment to itself and an additional commission payment to the Select sales representative (in the case here, Forman and Composto) procuring the order. *Id.* at 1333–34 (finding of fact ¶ 368) (citing DX 65 § 4(A) & (C); 1 Tr. 169:5–20 (Paliafito); 4 Tr. 648–49:16–25, 1–10 (Hupe)).

27. Under the Agreement, Paliafito agreed to pay Select a five percent commission for all sales made under the Select/Paliafito Agreement:

Select shall receive a commission of five percent of the net list price received by Paliafito on all sales generated by Select and other entities with whom Select contracts for the sales and/or licensing of "Super Grip Ball" ... for purposes of this Agreement, the term "net list" shall mean the wholesale price less all applicable discounts.

*Id.* at 1334 (finding of fact ¶ 368) (citing DX 65 ¶ 2(B) and ¶ 4(A)).

28. Paliafito also agreed to pay to Select a sum equal in amount to commissions ranging between five and fifteen percent earned by Select's sales representatives such as Forman and Composto:

Select shall receive a payment from Paliafito equal in amount to all "rep fees" or sales commissions incurred by Select from third parties who have been contracted to represent and/or sell "Super Grip Ball" which shall be no greater than the range of five percent to fifteen percent of the net list prices per order.

*See* DX 65 ¶ 4(C). Under the Select/Paliafito Agreement, Select indemnified Paliafito from and against any loss, liability, or damage arising out of any claim brought by any sales representative claiming a commission pursuant to the payment terms of contracts between Select and the sales representatives. *Id.* § 11.

29. Under the Select/Paliafito Agreement, Paliafito was obligated to pay commissions to Select (and, through Select, its representatives, such as Forman and Composto), within thirty days of the date orders for Grip Ball were shipped or within fifteen days of the date payment for orders was received by Paliafito, whichever was later. *Id.* at 1334 (finding of fact ¶ 369) (DX 65 § 5(A)). Because under these terms Paliafito might have had to issue commissions payments on a daily basis, Paliafito and Select verbally agreed that the payments could be made once a month, usually on the 15th day of the month. *Id.* (citing 2 Tr.2d 110:7–21 (Hupe)).

30. Neither Forman nor Composto ever objected to Select's verbal agreement that commissions could be paid on the fifteen day of the month following the month during which Paliafito received payments from customers as opposed to fifteen days after the date of payment. *See* Hupe Dec. ¶ 17.

31. In the event of a commission dispute, Select (or any other representative) was free to visit Paliafito's office and review Paliafito's records. *Select I,* 828 F.Supp. at 1334 (find-

ing of fact ¶ 370) (citing 9 Tr.2d 968:7–16 (Hart)).

32. Neither Forman nor Select ever bought Grip Ball on their own account for resale to customers; they merely sold the product on behalf of Paliafito for a commission. *See* Hupe Dec. ¶ 10. Paliafito was the vendor of record with all of the customers serviced by Select and Forman. Paliafito sold product to the customer, invoiced the shipment, received payment, accepted returns, and was liable to the customer for any breach of contract. Paliafito provided product insurance to the customer, provided requested television advertising and advertising allowances/credits, negotiated prices, and provided trademark and patent protection.

33. Paliafito had approval rights concerning Select's choice of sales representatives including the right to discuss the performance of existing sales representatives, and the right to give prior approval on all decisions to replace existing representatives or retain new representatives. *See* DX 65 ¶¶ 2(B), 9(5). Also, Paliafito had the right to prior approval of modifications to the trade merchandising techniques used. *See* DX 65 ¶ 2(D).

## D. THE PALIAFITO/SELECT/FORMAN SYSTEM IN OPERATION.

34. In a letter dated February 26, 1991 from Meisenheimer to the "Select Creations Sales Force," and stamped received by Forman that next day (and produced by Forman to Paliafito), Meisenheimer requested the Select representatives to fax to Select's office the names of all of their accounts in order to "coordinat[e] *our* relationship with Paliafito...." *See* Jacobson Dec., Exh. 2 (emphasis added). The letter added that "Paliafito will be taking on representatives in specific areas where there is no coverage.... Since you are a valued rep, we do not want to have any overlap. I will keep you informed if there is any other rep in your territory appointed to cover areas you have never covered or do not intend to cover." *Id.*

35. At all relevant times, Forman was part of the "Select Creations Sales Force," a sales force which, *inter alia*, acted on behalf of Paliafito pursuant to the Select/Paliafito Agreement to procure orders for Grip Ball from the mass market on behalf of Paliafito.

36. On March 18, 1991, Meisenheimer sent a cover letter enclosing a "Sales and Informational Kit on Super Grip Ball" to the "Sales Force of Select Creations, Inc." *See* Jacobson Dec., Exh. 3. In his cover letter, Meisenheimer instructed the sales representatives to establish MAI/Paliafito America, Inc. as the vendor of the product. Meisenheimer added that "Select Creations, Inc. is the only marketer of the product for mass merchandising. You have been hired by us to be our exclusive representative to the mass merchandisers in your territory."

37. Meisenheimer added that if a buyer told the Select representative that he had been approached by another representative group, the buyer could contact Paliafito to confirm that Select and its representatives were the only authorized representative group to sell Grip Ball. *Id.* at 212. Meisenheimer also told the representatives that Grip Ball was available in net packaging, only while supplies lasted, at a per unit price of $7.99 FOB. *Id.*

38. A letter from Scott Hupe at Paliafito to "all sales representatives and distributors of Super Grip Ball" (including Forman) references an enclosed sales kit and reads:

I am excited to have your expertise associated with *our* great product Super–Grip Ball. It is our intention to make your job easy by providing you with the tools you need to make your sales efforts profitable. In conjunction with Select Creations, Inc., I have prepared a sales kit to make your presentations smooth and professional.

. . . . .

It is *extremely important* that you study this kit and become familiar with all details regarding Super Grip Ball.

. . . . .

It is the philosophy of Paliafito America, Inc. to represent to the American consumer that *our* products are high in quality and superior in craftsmanship. It is my hope that you will have success selling Super–Grip Ball and *our* future products, I

will assist you in any way possible to make your efforts worthwhile and profitable.

Enclosed is a list of representatives who have the authority to sell Super Grip–Ball throughout the United States and its territories.

*Id.* (emphasis added and in original).

39. Hupe's letter purports to include a list of house accounts, *id.* at 215–16, a "Mass Merchandising Sales Force List" listing Forman as the exclusive sales representative authorized to sell Grip Ball in certain Northeast and mid–Atlantic states, *id.* at 217–18, the upcoming spring television advertising campaign, *id.* at 219–28, and a "Salesmen Guide" listing pertinent sales strategies, *id.* at 230–33. While the Forman defendants argue that there is no proof that these documents were actually enclosed with the letter, Composto concedes that Forman did receive the sales kit.[2] Composto June 1995 Aff. ¶¶ 11, 12.

40. The sales kit that Paliafito provided to Forman and Composto contained highly sensitive information relating to Paliafito's operations. *See* Hupe Dec. ¶ 18.

41. On March 22, 1991, Scott Hupe sent a letter, stamped received by Forman on that day (and produced to Paliafito by the Forman defendants) (*see* Jacobson Declaration, Exhibit 7) to *Paliafito's* sales representatives demanding that *Paliafito's* sales force generate more orders. In that letter, Paliafito stated that "each sales representative has sufficient evidence that Paliafito holds the rights to market this patented product." *Id.* at 1.

42. In their Answer, the Forman defendants admit that they knew Paliafito claimed to own the exclusive rights to Grip Ball. *See* Composto Answer ¶ 14.

43. Composto knew that Paliafito retained Select and its representatives to act as Paliafito's sales force because Paliafito had no sales force of its own. In his sworn affidavit submitted to the Supreme Court of New York on behalf of MAI, (*see* Jacobson Dec., Exh. 8), Composto states: "Forman Marketing is a sales representative organization and acts as the sales force for manufacturers/distributors in the toy and game business that don't have their own sales force." *See* Jacobson Dec, Exh. 9, ¶ 2. Later, in paragraph 9 of his affidavit, he clearly implies that Paliafito is one such "manufacturer/distributor" which Forman represented. *Id.* ¶ 9 ("All of the other manufacturers/distributors *represented* by Forman Marketing deal with us in a very professional manner in the way they manage their business and paper flow. PAI truly represents an anomaly in this regard.").

44. On March 25, 1991, pursuant to Paliafito's and Select's instructions, Forman and Composto instructed all of their accounts to set up "MAI/Paliafito America, Inc." as the vendor of record. To wit:

(a) Composto sent a letter to Jeff Stack at Toys R Us containing vendor information listing "MAI Paliafito America, Inc." as the vendor of record, *see* Jacobson Dec., Exh. 5; and

(b) Composto also sent a letter to Bill Talios at Lionel Leisure containing vendor information listing "MAI/Paliafito America, Inc." as the vendor of record, *id.* Exh. 6.

45. On April 9, 1991, Paliafito sent to Composto an internal balance sheet and a certificate of product insurance to pass along to Jeff Stack at Toys R Us. *See* Jacobson Dec., Exh. 10. The certificate of insurance listed Paliafito as the insured. *Id.*

46. May 13, 1991, Bob LaPlaca at Forman faxed a letter to Jennifer Taye at Childcraft containing a "Product Information Sheet for Vendor Completion" listing "Paliafito/Select Creations" as the vendor of record and listing Paliafito's address. *Id.* Exh. 11.

47. On June 5, 1991, Meisenheimer sent a letter to Scott Hupe at Paliafito, stamped received by Forman the next day, going over

---

**2.** It appears as though the letter from Meisenheimer, the letter from Hupe, and the alleged sales kit were forwarded together because (1) both the Meisenheimer letter, and the Hupe letter refer to the "enclosed sales kit," (2) the Hupe letter refers to the inclusion of the list of sales representatives, which is included in the consecutively numbered documents following the letters, and (3) the documents which comprise the "sales kit" logically fit together, are documents which one would expect to find in a sales kit, and are consecutively numbered.

a plan of action for 1992. *See* Jacobson Dec., Exh. 12. Meisenheimer addressed packaging of products, possible new products to be introduced, and requested Paliafito to send to Select product specifications to prepare sell sheets to retailers.

48. Meisenheimer also requested that Paliafito arrive at a sheet price for each item and recommended discounts to retailers to promote sales. Meisenheimer noted that Paliafito will be able to take its customer receivables and obtain loans up to 70% of the total amount of receivables to "keep [Paliafito] in cash flow...." *Id.*

49. Meisenheimer also discussed promotion and advertising strategy and public relations special events. *Id.* at 3.

50. In a postscript, Meisenheimer reminded Paliafito to "[r]emember one important thing Steve [Composto] said, 'Have *your* products carry a "look" to them so that the customer identifies all *your stuff as coming from Paliafito'* " and noted that Scott Hupe should feel free to bounce ideas off Composto. *Id.* (emphasis added).

51. Paliafito did, in fact, furnish to Select and Composto all of the information requested in Meisenheimer's letter and did consult Composto on sales strategy. *See* Hupe Dec. ¶ 19.

52. On June 6, 1991, Mike Barker at Paliafito faxed a letter to "all representatives" providing them information relating to Paliafito's inventory situation. *See* Jacobson Dec., Exh. 13. Barker wrote: "In order to prevent any further communication problems in respect to Super Grip Ball, Paliafito America, Inc. will update all of its representatives on a weekly basis as to its current and future inventory status." *Id.* He continued: "[F]or all representatives approaching mass market buyers, I urge you to please call me before you make a sales call so that we can discuss our current and future inventory status." *Id.* Barker then directed the sales representatives to sell Grip Ball packaged in net bags instead of in clamshell "whenever it is possible" since the clamshell inventory was depleted. *Id.*

53. On June 25, 1991, Steve Composto faxed a letter to Bob Hinshaw requesting him to "[s]end [o]rders" and containing a "Vendor File Editor" listing "Select/Paliafito" as the vendor and Forman as the "sales representative." *Id.*, Exh. 14.

54. On July 11, 1991, Bob Fontana at Forman sent a letter to Mark Kaplan at Jamesway attaching a copy of the Wall Street Journal article which stated: "In January, Mr. Paliafito outbid three other companies for national marketing rights to the games by, among other things, promising to spend at least $1 million on advertising." *See* Jacobson Dec., Exh. 16.

55. Paliafito performed its obligations under the advertising provisions of its agreement with MAI and spent approximately $1.1 million on advertising or $00.73 per unit. If "co-op advertising" (the advertising allowance or credit given to retailers) is included, total advertising expenditures total $1,300,000 or $00.90 per unit. *Id.* at 1322 (citing DX 90; DX 92 at 2, 4 Tr.2d 665, 667–68, 670: 8–11, 22–25, 1–16, 2–15 (Hupe)).

56. This advertising expenditure was critical to Forman because Forman's largest account, Toys R Us, refused to buy any Grip Ball product until Paliafito agreed to provide television advertising. *See* Hupe Dec. ¶ 9.

### E. PALIAFITO PAYS FORMAN MAY AND JUNE COMMISSIONS.

57. On June 28, 1991, Paliafito paid Forman $35.96, the amount of commissions due Forman for the month ending May 31, 1991. *See* Jacobson Dec., Exh. 15.

58. Neither Forman nor Composto ever objected to the payment of their May 1991 commissions. *See* Hupe Dec. ¶ 16.

59. On July 22, 1991, Select faxed a completed vendor information sheet to Forman for Jamesway Corporation. In it, Select listed "Select/Paliafito America, Inc." as the vendor and listed Paliafito's address. Select also listed Forman as the *"sales agency."* *See* Jacobson Dec., Exh. 17.

60. On July 22, 1991, Composto acknowledged that he received a commissions check in the amount of $847.04, the amount of commissions due Forman for the month ending June 30, 1991. *Id.*, Exh. 18.

61. Neither Forman nor Composto ever objected to the payment of their June 1991 commissions. *See* Hupe Dec. ¶ 16.

### F. EARLY COMMUNICATION BETWEEN JOY LEE AND SELECT.

62. On July 23, 1991, Thomas Meisenheimer spoke to Joy Lee by telephone for forty-two minutes. *See Select I,* 828 F.Supp. at 1334 (finding of fact ¶ 376) (citing DX 1500, Tab E, call no. 36.)

63. After their conversation, Meisenheimer sent a fax stating, "Joy, Let's get it done! Tom." Meisenheimer testified that "Let's get it done" refers to "working together between Paliafito and Mantae to solve the difficulties and make things happen." *Id.* (finding of fact ¶ 377) (citing 13 Tr.2d 1407:2–14 (Meisenheimer).) With this fax, however, Meisenheimer enclosed Select's and Meisenheimer's resumes apparently to vie for Mantae's business. *Id.* (citing 4 Tr.2d 399–400:11–25, 1–18 (Joy Lee); DX 287).

64. Later that day, Meisenheimer faxed a letter to Joy Lee (DX 288) confirming a July 27th morning meeting with Joy Lee in Los Angeles and a second meeting with Joy Lee and the Paliafito brothers. In this letter, Meisenheimer stated his willingness to stay through Monday, July 29, 1991 "to assure us enough time to accomplish what we need to do." *Id.* at 1335 (finding of fact ¶ 378) (citing 4 Tr.2d 401–02:1–25, 1 (Joy Lee); DX 288, at 1 (last paragraph), at 2, ¶ 1).

65. Paliafito was not aware of these communications. *See* Paliafito Dec. ¶ 16; Hupe Dec. ¶ 20.

### G. PALIAFITO'S NATIONAL SALES MEETING.

66. On or about August 2, 1991, the day before Paliafito's national sales meeting, Paliafito flew Composto to its offices in Los Angeles. While in Los Angeles, Composto reviewed Paliafito's books and records to determine whether Forman was owed any additional commissions. Following his review, Composto told Paliafito that he was satisfied that Paliafito was current in paying Forman's commissions. *See* Hupe Dec. ¶ 11.

67. That night, Composto went to dinner at the Cheesecake Factory in Redondo Beach, California, with Hupe, Mike Ross, and Greg Waylock, Paliafito's vice president. During dinner, Greg Waylock and Hupe related to them Paliafito's concern that Joy Lee, whom Paliafito did not trust, might be approaching Paliafito's sales representatives to enlist them in her effort to eliminate Paliafito and take over distribution herself.[3] Hupe recalls that Composto assured the Paliafito representatives that he was "on [Paliafito's and Forman's] team", "not to worry," and expressed confidence in Paliafito's future and his relationship with it.[4] *Id.* ¶ 12.

68. On August 3, 1991, Paliafito held a meeting in California for all Grip Ball sales representatives, at which Joy Lee and Mantae gave a presentation. *See Select I,* 828 F.Supp. at 1337 (finding of fact ¶ 411) (citing DX 4; 1 Tr. 70–72:2–25, 1–25, 1–11 (Ross)).

69. The agenda for this meeting—produced from the files of Forman—reflects that it was called a "Paliafito America, Inc. 1991 National Sales Meeting." *See* Jacobson Dec., Exh. 19.

70. During the August sales meeting, no one associated with Mantae complained about Paliafito's performance or indicated that Paliafito had been terminated. *Id.* (finding of fact ¶ 413) (citing 1 Tr. 70–71:20–25, 1–6 (Ross); 4 Tr.2d 406:7–11 (Joy Lee)).

71. At the sales meeting, Paul Moss, another sales representative, and Composto complained about not receiving commissions on time. They had the mistaken understanding that they were to get paid their commissions fifteen days after the close of the previous month in which ordered goods had been

---

3. Composto does not recall this conversation. He contends that "it is possible that something of that sort may have been said and that Composto did not hear it, since Composto is and was totally deaf in his right ear and in fact the restaurant was loud, noisy and boisterous." (Forman's Response to Paliafito's Proposed Finding of Fact ¶ 78.)

4. Composto remembers reassuring the Paliafito representatives, but cannot recall telling them "not to worry," and questions whether he would offer such an assurance.

*shipped. Id.* at 1336 (finding of fact ¶ 414) (citing 4 Tr. 679–80:7–25, 1–17 (Hupe)).

72. The commissions arrangement for Select sales representatives under the Select/Paliafito Agreement was discussed at the sales meeting. *Id.* (finding of fact ¶ 415) (1 Tr. 118:10–17 (Ross)).

73. Scott Hupe confronted Tom Meisenheimer as to why Meisenheimer had not told the sales representatives the terms to which Select had agreed. Meisenheimer acknowledged that he failed to inform the sales representatives of the correct terms of payment. *Id.* (finding of fact ¶ 416) (4 Tr. 680–81:18–25, 1–8 (Hupe)).

74. The previous day, Hupe had discussed the payment terms of the Select/Paliafito Agreement with Composto. In that discussion, Hupe had informed Composto that the Select/Paliafito Agreement obligated Paliafito to pay commissions to Forman on the fifteenth day following the month in which Paliafito received payment from the customer and that he and his company were bound to those terms. *See* Hupe Dec. ¶ 14.

75. Composto was not happy with the payment terms of the Select/Paliafito Agreement. However, most of Composto's anger was directed towards Meisenheimer at Select who never told Composto of the payment terms of the Select/Paliafito Agreement. Thereafter, Composto never protested or stated that he believed that he was not bound to the payment terms. *Id.* ¶ 15.

76. Indeed, after being apprised of the payment terms, Composto and Forman accepted all later commission payments without protest. In fact, apart from the August sales meeting, neither Forman nor Composto ever objected to Paliafito's commissions payments for the months of May, June, July, August, and September 1991, which attached commission statements clearly reflected that commissions were paid after Paliafito received payment from customers. *Id.* ¶ 16.

## H. AUGUST 12, 1991: SELECT AGAIN COMMUNICATES DIRECTLY WITH JOY LEE.

77. On August 12, 1991, Petrovich and Meisenheimer sent a letter to Joy Lee, ostensibly for the purpose of discussing a conflict between the marketing of Sticky Wicket, a Grip Ball derivative, and Grip Ball. *See* Jacobson Dec., Exh. 20. It is apparent that Forman was aware that Select was in direct contact with Joy Lee, bypassing Paliafito. A copy of this letter was produced to Paliafito from Forman, and fax traffic indicates that the letter was faxed to Forman from Select on August 12, 1991. *See* Jacobson Supp. Dec., Exh. 1.

78. Pursuant to paragraph 9 of the Exclusive Distribution Agreement, Paliafito had the exclusive license to Grip Ball Game patent and related patents, such as any patent covering "Sticky Wicket." *See* DX 11A § 9.

79. In the August 12, 1991 letter, Select wrote:

> Select Creations, Inc., through its marketing abilities, has brought you over $8,000,000 in orders since Toy Fair. We consider this a monumental accomplishment considering the problems we encountered with Paliafito in delivery, invoicing, etc. We know we have just tapped the surface with our ability to sell your products.
>
> The majority of the sales force has built solid relationships with major buyers and we will continue to bring you large domestic and/or LC orders for the life of Super Grip Ball and the related products you develop.
>
> We are committed to you for the long term. Therefore, it is important that we have these contracts in place and to jointly develop the best mode of operation to service our buyers.
>
> Let us speedily come to an agreement to utilize our joint resources and abilities to achieve maximum results and benefits for all.

*Id.* at 2.

80. No one at Select, MAI, or Forman ever apprised Paliafito of this letter or the communications that it contained. *See* Paliafito Dec. ¶ 16; Hupe Dec. ¶ 20.

## I. PALIAFITO PAYS FORMAN JULY COMMISSIONS.

81. On August 23, 1991, Composto acknowledged receipt of a commissions check

in the amount of $8,775.05, the amount of commissions due Forman for the month ending July 31, 1991. *See* Jacobson Dec., Exhs. 21 & 22.

82. Neither Forman nor Composto ever objected to the payment of their July 1991 commissions. *See* Hupe Dec. ¶ 16.

### J. JOY LEE UNDERMINES PALIAFITO'S EXCLUSIVE DISTRIBUTION AGREEMENT.

83. It is undisputed that, unbeknownst to Paliafito, Joy Lee and Composto met with Jeff Stack at Toys R Us in September or October of 1991. At this meeting, Joy Lee offered to sell Grip Ball to Toys R Us at a cheaper price than that charged by Paliafito to be filled directly from her warehouse.

84. On September 13, 1991, Joy Lee wrote Petrovich stating:

As we discussed on the phone, we are all losing time each day due to the failure to reach a decision on the Paliafito problem. If we do not solve the problem immediately, I believe the market, which is benefiting all of us, may be destroyed.

I suggest strongly that Select, as the mass marketing organization, should also have the responsibility to make the market successful for all of us involved with the product. Without your support in this matter, I must assume that you are not as interested, as is MAI, in the success of this product.

In short, I need an indication from you that you believe in this product as strongly as we do, or MAI must assume that it is using the wrong mass marketing organization. I will continue to do whatever is necessary in order to straighten out the problem with the Paliafitos. However, at this critical time, I need your full cooperation in order to solve this problem, which cooperation must be forthcoming immediately.

If we do not reach a decision in this matter by Monday, I must assume that your interest does not lie with the success of our product.

*See Select I,* 828 F.Supp. at 1341 (finding of fact ¶ 440) (citing DX 411).

85. In the fall of 1991, Petrovich projected that 1992 sales of Grip Ball would be $28,000,000. *Id.* (finding of fact ¶ 441) (citing 3 Tr. 612–13:5–25, 1–3 (Petrovich).) At the time of the hearing, Select received a five percent commission or $1,400,000. *Id.* (finding of fact ¶ 441) (citing 3 Tr. 510–11:23–25, 1–2 (Petrovich)).

86. On September 13, 1991, Mike Ross, Paliafito's sales representative to the sporting goods retailers, had several phone conversations with Joy Lee. *Id.* (finding of fact ¶ 444) (citing DX 6; DX 1500, Tab K, call nos. 35, 55; 1 Tr. 77–79:20–25, 1–25, 1–11 (Ross)).

87. Ross testified that Joy Lee told him that her relationship with Paliafito had broken down and "that she was going to have to . . . get the product back." *Id.* at 1341 (finding of fact ¶ 445) (citing 1 Tr. 77–78:20–25, 1–3 (Ross)). Ross testified that when Joy Lee asked, he indicated that he thought that Paliafito had performed in an acceptable manner and that he did not have a gripe against Paliafito. Ross stated that Joy Lee indicated that she was not satisfied with Paliafito's performance and told Ross that she was going to get the game back through litigation and "inquired firstly to [Ross] joining her in a suit against Paliafito for their lack of performance in regards to the product." *Id.* at 1341–42 (finding of fact ¶ 445) (citing 1 Tr. 78–79:15–25, 1–23 (Ross)).

88. Ross told Joy Lee that he was satisfied with Paliafito's performance and did not think he had a claim against Paliafito. Ross testified Joy Lee told him "that it's important that we all stand together in this and that those that stand with me [Joy Lee] now will be a part of marketing this product in the future." *Id.* at 1342 (finding of fact ¶ 446) (citing 1 Tr. 79:3–11 (Ross)).

89. Ross also stated that during the conversation, Joy Lee told him that they would be meeting with Select later that day "to talk about the position they would take to sue Paliafito and get the product back." *Id.* at 1342–43 (finding of fact ¶ 455) (citing 1 Tr. 81:8–10 (Ross)).

90. Ross stated that Joy Lee "asked [Ross] to join in the lawsuit with Select

against Paliafito." *Id.* at 1343 (finding of fact ¶ 456) (citing 1 Tr. 81:7–20 (Ross)). Ross testified that Joy Lee concluded the conversation by saying "that they would be meeting with Select's people and they'd get back to [Ross] and let [him] know what was going on," which Joy Lee did not do. *Id.* (finding of fact ¶ 456) (citing 1 Tr. 83–84:23–25, 1–4 (Ross)).

### K. PALIAFITO PAYS FORMAN AUGUST COMMISSIONS.

91. On or about September 23, 1991, Paliafito paid Forman $53,394.77. *See* Jacobson Dec., Exh. 23. On October 3, 1991, Select paid Forman 7,208.99. *Id.*, Exh. 24. These two payments constituted the total commissions owed Forman for the month ending August 31, 1991. *Id.*, Exh. 25.

92. Neither Forman nor Composto ever objected to the payment of their August 1991 commissions. *See* Hupe Dec. ¶ 16.

### L. THE OCTOBER 7, 1991 SALES MEETING.

93. On September 24, 1991, Thomas Meisenheimer set up a sales meeting to be held on October 7th in Milwaukee, Wisconsin. He worked with Joy Lee or Bertrand Levesque (an officer of MAI) in planning and setting up the meeting, and Joy Lee paid for at least part of the meeting. Meisenheimer faxed a list (DX 290) to Joy Lee informing her of all the people who would be attending the October 7th sales meeting for Select sales representatives and others involved in the sales and distribution of Grip Ball. (DX 290, at 1–2). He told Joy Lee to send him a check for $12,581 so that he could pay the costs for this meeting. In the letter, Meisenheimer stated: "If you send me a check for this today, I will take care of all arrangements and details." *Id.* at 1346 (finding of fact ¶ 493) (citing DX 290, at 2; 6 Tr.2d 588–90:23–25, 1–8, 18–22 (Joy Lee)).

94. On October 7, 1991, Joy Lee, Levesque, Nowak, Storm, Petrovich, Meisenheimer, John Burke, Robert Hooper, Moss, Steve Composto, other sales representatives contracting with Select and others met at the Grand Hotel in Milwaukee to discuss Super Grip Ball and other products. *Id.* at 1348 (finding of fact ¶ 510) (citing 3 Tr. 521–22:1–

25, 1–25 (Petrovich); 6 Tr.2d 590–91, 597:21–25, 1–11, 17–18 (Joy Lee); DX 88).

95. Paliafito did not attend this meeting. Paliafito had not been invited to it, and had not been given notice of it. *Id.* (finding of fact ¶ 511) (3 Tr. 472, 522:12–16, 1–10 (Petrovich); 4 Tr. 643:13–19 (Petrovich); 4 Tr. 694:4–14 (Hupe); 2 Tr. 416:9–11 (Paliafito)).

96. Brian Bettis, a toy inventor, testified, however, that a primary purpose of this meeting was to discuss what was going on with Grip Ball. *Id.* (finding of fact ¶ 512) (1 Tr. 28–29, 33, 35:24–25, 1–9, 16–22, 6–13 (Bettis)). In addition, while there were several other items on the agenda, more than half of the meeting agenda concerned the Grip Ball products. *Id.* (finding of fact ¶ 512) (citing DX 292; DX 293).

97. At this meeting, Joy Lee announced that "we" (presumably Mantae) had filed a lawsuit to terminate Paliafito. *Id.* (finding of fact ¶ 513) (6 Tr.2d 594–95:25, 1–23 (Joy Lee)).

98. Joy Lee instructed the sales representatives to have their accounts switched from Paliafito's vendor number to Mantae's new vendor numbers. *Id.* (finding of fact ¶ 515) (citing DX 292/DX 293 at F(1)(d); 6 Tr.2d 597, 599–601:1–12, 8–25, 1–25, 1–12 (Joy Lee)).

99. Bettis testified that during the sales meeting, all of the sales representatives met with Joy Lee, Petrovich, and Meisenheimer. *Id.* (finding of fact ¶ 516) (citing 1 Tr. 35:7–19 (Bettis)). Petrovich testified, however, that only he and Storm had individual meetings with the sales representatives. *Id.* (finding of fact ¶ 516) (citing 3 Tr. 522:17–523:6 (Petrovich)).

100. When Brian Bettis asked why Paliafito was not there, Rob Hooper stated, "Paliafito who?" Others present laughed. *Id.* (finding of fact ¶ 517) (citing 1 Tr. 34:4–18 (Bettis)).

101. During the meeting, Joy Lee also presented her new products to the group. *Id.* at 1349 (finding of fact ¶ 518) (citing 3 Tr. 532–33:12–25, 1–6 (Petrovich); DX 292/DX 293 at F(3)). Petrovich stated that he was interested in Joy Lee's new products because

she was offering an opportunity to make more money if he worked with her. *Id.* (finding of fact ¶ 518) (citing 3 Tr. 532–33:12–25, 1–6 (Petrovich)).

102. Joy Lee promised to pay Forman commissions that it claimed were owed by Paliafito. In a letter dated April 29, 1992, and never produced to Paliafito by Forman, Composto wrote to Joy Lee: "I don't believe that I threatened you in any way—my intent was to be sure that you clearly understood my feelings with regard to severely past due commissions (which were promised by you at the meeting last October) for 1991." *See* Jacobson Dec., Exh. 26.

103. On October 9, 1991, Composto wrote to Joy Lee: "Thanks for a wonderful meeting. I feel that positive moves were accomplished." *See* Jacobson Dec., Exh. 27. He also wrote to Meisenheimer: "We all appreciate the efforts that you and Sam put forth at our sales meeting. Tom, it was a great meeting—lets [sic] go get them!" *See* Jacobson Dec., Exh. 28.

104. During an October 11, 1991 conference call between Hart and Hupe, on the one hand, and Storm and Petrovich on the other, neither Petrovich nor Storm informed Paliafito that Select had filed a lawsuit against Paliafito or that a sales meeting including Grip Ball had occurred on October 7th. *See Select I*, 828 F.Supp. at 1350 (finding of fact ¶ 532) (citing 3 Tr. 509:8–10 (Petrovich); 2 Tr.2d 113:14–24 (Hupe); 7 Tr.2d 671:8–11 (Storm)).

## M. OCTOBER 10–11, 1991: PALIAFITO PAYS COMMISSIONS DUE AND OWING.

105. On October 10, 1991, Select faxed a commission summary (DX 219), a breakdown listing commissions that Paliafito purportedly owed Select through September 30, 1991, to Hart. *Id.*, at 1349 (finding of fact ¶ 525) (citing DX 219).

106. The above-referenced October 11, 1991 conference call (*see* FOF ¶ 104) related to the issue of commissions that Select believed it was owed. *Id.* (finding of fact ¶ 526) (citing 2 Tr.2d 193–94, 112:10–25, 1–17, 1–9 (Hupe); 7 Tr.2d 671:12–16 (Storm); DX 219).

107. At the conclusion of the conference call, Hupe informed Petrovich and Storm that Paliafito would be sending Select several checks and the amounts of the checks. Petrovich indicated that he thought that the amount was fairly close to what he figured was actually due and payable. *Id.* at 1349–50 (finding of fact ¶ 529) (citing 2 Tr.2d 113:2–13 (Hupe)).

108. As a result of this teleconference, Paliafito issued several checks to Select which Select promptly deposited into its bank account. *Id.* at 1350 (finding of fact ¶ 530) (citing 3 Tr. 518–19:14–25, 1–17 (Petrovich)). These checks included a check for $52,491.56, a check for $172,851.64 and a check for $168,027.75. *Id.* (finding of fact ¶ 530) (citing DX 402; 2 Tr.2d 112–13:16–25, 1 (Hupe)).

109. From the day of the conference call until this litigation began, no one from Select contacted anyone at Paliafito and claimed that Paliafito owed Select additional amounts. *Id.* (finding of fact ¶ 531) (citing 2 Tr.2d 113:2–13 (Hupe)).

110. On October 17, 1991, Select paid Forman $57,255.27, the amount of commissions due Forman for the month ending September 30, 1991. *See* Jacobson Dec., Exh. 29.

111. Neither Forman nor Composto ever voiced any objection to the commission payments that Paliafito tendered to Forman through Select. *See* Hupe Dec. ¶ 16.

## N. CANCELLATION OF TOYS R US/PALIAFITO ORDERS.

112. On October 23, 1991, Steve Composto notified Jeff Stack, the buyer at Toys–R–Us, that: "Mantae America has made a decision to eliminate their distributor for Super Grip Balls, and market and ship the product on their own. Jeff, please cancel all open orders you have for MAI/Paliafito Inc. Replacement orders should issued to MAI/Grip Toys Inc." This letter was copied to Nowak, Joy Lee, and Meisenheimer. *Id.* (finding of fact ¶ 537) (citing DX 297).

113. Toys R Us regarded the open purchase orders as legally binding contracts between Paliafito, the vendor of record, on the

one hand, and Toys R Us, on the other hand. *See* Declaration of Michelle Schaap ¶¶ 3–5.

### O. PALIAFITO DISCOVERS MISDEEDS.

114. On or about October 21, 1991, Paliafito first discovered that Select and its representatives had conspired with Joy Lee to switch Paliafito's accounts to MAI.

115. On that day, Paliafito faxed a letter to Joy Lee notifying MAI of breach of contract. Paliafito notified MAI that it had breached the Exclusive Distribution Agreement by arranging for a meeting with M.W. Kasch; by stating that MAI terminated Paliafito; by stating that all future purchases of the game would be through MAI, not Paliafito; by directly meeting with customers; by organizing and attending a meeting with Select's sales representatives; and by filling customers' orders without the knowledge and consent of Paliafito. *See Select I*, 828 F.Supp. at 1350 (finding of fact 535) (citing DX 226).

### P. TOYS R US ISSUES GRIP BALL ORDERS FILLED BY MAI.

116. On October 31, 1991, just one week after Composto gave his instructions to Toys R Us, Toys R Us issued a purchase order in the amount of $391,528. *See* Jacobson Dec., Exh. 30. The purchase order listed *Paliafito's* vendor number (11263) not MAI's vendor number (37716) the number listed on all subsequent purchase orders issued to MAI.

117. This order was subsequently filled directly by MAI. *See* Jacobson Dec., Exh. 31 (letter dated November 26, 1991 from Hooper at Select to Composto confirming that the Toys R Us orders invoiced on November 4, 1991 (four days after the purchase order was issued) had been shipped).

118. Following Composto's instructions to reissue new purchase orders to MAI, Toys R Us issued another 17 purchase orders to MAI in the years 1991 through 1993, all of which listed Composto as the salesperson. The purchase orders totalled $1,285,553. *See* Jacobson Dec., Exhs. 32 through 48.

### Q. FORMAN'S CLAIMS FOR COMMISSIONS.

119. On September 23, 1993, Forman filed its Answer and Counterclaim in this action and claimed that Paliafito owed it $277,713.72 in commissions "with interest from February 9, 1991," a date six days before the effective date of the Select/Paliafito Agreement. *See* Composto Ans. ¶¶ 28, 30.

120. In its counterclaims, Forman seeks commissions from Paliafito based upon a purported agreement with Paliafito. *See* Composto Answer ¶ 26 ("[Forman] rendered work, labor, and services to [Paliafito], in acting as a sales representative ..., in 1991, *pursuant to an agreement with the said Paliafito* under which [Forman] was to receive commissions.") (emphasis added); *id.* ¶ 29 ("[Forman] rendered work, labor and services to Paliafito in 1991 at the *agreed* price and reasonable value of $277,713.72....") (emphasis added).

121. Forman also sued Select in the Supreme Court of New York for commissions based upon a purported sales representation agreement with Select. In the Verified Complaint, Forman alleged:

> 5. On or about February 8 or 9, 1991, Select asked [Forman] to sell to [Forman's] customers, on behalf of Select, a popular toy known as "Grip Ball," to which [Forman] agreed.
>
> 6. [Forman] and defendant agreed that defendant would pay to [Forman] an agreed upon commission for such sales as were made by or through the efforts of [Forman].
>
> 7. [Forman] acted as sales representative in selling the Grip Ball, earning commissions at the agreed price and reasonable value of $52,000 in the year 1991, and $87,000 in the year 1992, or a total of $139,000, no part of which has been paid, though duly demanded.

*See* Jacobson Dec.Exh. 49 at 3.

122. Forman had no contract with Paliafito. Forman only contracted with Select. *See* Composto Proposed Findings of Fact, ¶ 12 ("Forman simply act[ed] as an independent contractor with Select."); *id.* ¶ 61 ("Forman had agreements only with Select."); Composto Aff. ¶ 43 ("[B]ut, as manufacturers

representatives, we were simply not acting as an agent for Paliafito, but as an independent contractor with Select.").

123. All of the orders that Forman and Composto procured on behalf of Paliafito, and for which Forman now seeks commissions from Paliafito, were obtained pursuant to the Select/Paliafito Agreement. *See* Paliafito Dec. ¶ 3.

124. On June 13, 1994, the New York Supreme Court entered an Order for Inquest against Select based upon the Verified Complaint and other submissions and ordered the clerk to set a hearing date for Forman to prove its damages. *See* Jacobson Dec., Exh. 50.

125. On May 15, 1995, a hearing was held on papers and judgment was entered in favor of Forman in the amount of $179,381. *See* June 20, 1995 Affidavit of Herbert Monte Levy.

126. The orders listed on Exhibit A attached to the Paliafito Declaration, for which Forman seeks payment of commissions, were never shipped to customers. *See* Paliafito Dec. ¶ 6, Exh. A.

127. Paliafito never received payment from customers for the orders set forth in Exhibit B to the Paliafito Declaration for which Forman seeks payment of commissions. *See* Paliafito Dec. ¶¶ 7–8, Exh. B.

128. Paliafito paid Forman the commissions listed on Exhibit C in the amount of $8,277.80. *See* Paliafito Dec. ¶ 9, Exh. C.

129. Paliafito received payment from customers on the orders set forth in the chart attached to the Paliafito Declaration as Exhibit D. However, commissions on these orders were due on or after November 15, 1991, the fifteenth day of the month following the month in which Paliafito received payment from customers. *See* Paliafito Dec. ¶¶ 11–14, Exh. D. Paliafito withheld payment of these commissions because it learned of the events described above on or about October 21, 1991. *See* Paliafito Dec. ¶ 11.

## II. *LEGAL STANDARD*

Summary judgment is no longer a disfavored remedy under the Federal Rules. *See* *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986) ("Summary judgment procedure is properly regarded as an integral part of the Federal Rules as a whole which are designed 'to secure the just, speedy and inexpensive determination of every action.'"). Indeed, Federal Rule of Civil Procedure 56 requires a district court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.* Thus, a complete failure of proof on an essential element of a plaintiff's case makes all other facts immaterial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53.

The party moving for summary judgment bears the initial burden of showing that there are no material facts in dispute and that judgment should be entered in its favor. *Hannon v. Turnage,* 892 F.2d 653, 656 (7th Cir.1990), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). A defendant moving for summary judgment may satisfy this initial burden by pointing to a plaintiff's failure to introduce sufficient evidence to support each essential element of the cause of action alleged. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53. A plaintiff moving for summary judgment bears a much greater initial burden; it must show that the evidence supporting its claims is so compelling that no reasonable jury could return a verdict for the defendant. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Once the movant satisfies this initial burden, the burden then shifts to the non-moving party, who

must "go beyond the pleadings" and designate specific facts to support each element of its cause of action, showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Becker v. Tenenbaum–Hill Associates, Inc.,* 914 F.2d 107, 110 (7th Cir.1990).

In evaluating a motion for summary judgment, the Court must draw all inferences in a light most favorable to the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir.1989). "However, we are not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) (citation omitted).

## III. *DISCUSSION*

Paliafito has moved for partial summary judgment (1) declaring the Forman defendants liable on Paliafito's claim that Forman and Composto breached their fiduciary duties to Paliafito (Count XIII of the Second Amended Counterclaim and Third–Party Complaint (Complaint)), (2) declaring the Forman defendants liable on Paliafito's claim for tortious interference with contract and prospective economic advantage (Count XI of the Complaint), and (3) dismissing Forman's counterclaims for commissions. The Forman defendants have also moved for summary judgment dismissing all of Paliafito's remaining claims against them and ordering Paliafito to pay all commissions they claim are due and owing.

### A. BREACH OF FIDUCIARY DUTY.

■ To recover on its breach of fiduciary duty claim against the Forman defendants, Paliafito must establish (1) the existence of a fiduciary duty, (2) the breach thereof, and (3) injury caused thereby. *See* Restatement (Second) of Torts § 874 ("One standing in a

fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation.").[5]

### 1. Did the Forman Defendants Owe Fiduciary Duties to Paliafito?

■ Paliafito claims that the Forman defendants owed it a fiduciary duty because they were Paliafito's subagents. According to Paliafito, Composto was the agent of Forman, Forman was the agent of Select Creations, and Select Creations was the agent of Paliafito. As its subagents, argues Paliafito, the Forman defendants owed it certain fiduciary duties.

■ Section 1 of the Restatement defines agency as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1). *See also Andrew J. Corsa & Son, Inc. v. Harnett,* 92 Misc.2d 569, 572, 400 N.Y.S.2d 1009, 1012 (N.Y.Sup.1977); *Troy Co. v. Perry,* 68 Wis.2d 170, 173, 228 N.W.2d 169, 171 (Wis.1975). In order for an agency relationship to exist, the principal need not exercise complete control over the agent; rather, the principal must have the right to control the agent's conduct with respect to those matters entrusted to the agent. According to the Restatement,

> An agent may be one for whose physical acts the employer is not responsible and who is called an independent contractor in order to distinguish him from a servant, also an agent for whose physical acts the employer is responsible. Thus, the attorney-at-law, the broker, the factor, the auctioneer, and other similar persons employed either for a single transaction or a series of transactions, are agents, although as to their physical activities they are independent contractors.

**5.** Although this Court has already held that Wisconsin law governs the Paliafito–Select agreement, *Select Creations,* 828 F.Supp. at 1354, there is some dispute as to whether Wisconsin or New York law governs the contract between Select and Forman. Because the laws of Wisconsin and New York are substantially similar with

regard to the breach of fiduciary duty question (both states apply the basic agency principles of the Restatement (Second) of Agency), the Court need not perform a choice of law analysis. Nevertheless, the Court will cite both New York and Wisconsin authority throughout its analysis in this subsection.

Restatement (Second) of Agency, § 1, *comment e.* *See also Pavalon v. Fishman,* 30 Wis.2d 228, 235, 140 N.W.2d 263 (Wis.1966) ("The general rule, in Wisconsin as well as elsewhere, is that brokers, whether employed for a single transaction or a series of transactions, are agents even though their physical activities resemble those of independent contractors.").

■ A subagent is "a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." Restatement (Second) of Agency § 5(1). "[T]he subagent stands in a fiduciary relation to the principal, and is subject to all the liabilities of an agent to the principal, except liability dependent upon the existence of a contractual relation between them." *Id., comment d.* *Accord Marra v. Katz,* 74 Misc.2d 1010, 347 N.Y.S.2d 143, 145 (N.Y.Sup.1973); *Hercules v. Robedeaux, Inc.* 110 Wis.2d 369, 374, 329 N.W.2d 240 (Wis. App.1982).

■ The existence of an agency relationship is a question of fact, normally best left for the ultimate trier-of-fact. *See Garcia v. Herald Tribune Fresh Air Fund, Inc.,* 51 A.D.2d 897, 380 N.Y.S.2d 676, 678 (N.Y.A.D. 1st Dept.1976) ("If the question of agency is not open to doubt, it is one for the court. But where no written authority of the agent has been proven, questions of agency and of its nature and scope ... are questions of fact to be submitted to the jury.") (quoting *Hedeman v. Fairbanks, Morse & Co.,* 286 N.Y. 240, 248–49, 36 N.E.2d 129, 133 (N.Y.1941)); *Noll v. Dimiceli's, Inc.,* 115 Wis.2d 641, 642, 340 N.W.2d 575 (Wis.App.1983) ("[T]he determination regarding whether a principal-agent relationship exists is a question of fact for the trier-of-fact."). Therefore, the burden on each party as movant in its respective summary judgment motion is substantial; provided that the nonmoving party can point to some evidence—beyond a mere "scintilla"—to support its version of events, summary judgment will be denied. *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2511–12. This case, however, presents the less common circumstance where the movant has clearly and convincingly established the existence of an agency relationship. Based on the compelling evidence introduced by Paliafito, the Court must conclude, as a matter of law, that the Forman defendants were the subagents of Paliafito. Forman and Composto have failed to introduce even a scintilla of evidence to rebut the mountain of evidence introduced by Paliafito to establish the existence of an agency relationship.

First, it is not seriously disputed that, pursuant to a written mass marketing consulting agreement, Select Creations acted as Paliafito's agent for the sale and distribution of Grip Ball products to mass market customers. *See* FOF ¶¶ 19–22. This written agreement clearly manifests both parties' consent that Select would act on Paliafito's behalf, (*see* FOF ¶ 22 (Select required to forward all orders received to Paliafito and perform certain services to the extent necessary "to meet Paliafito['s] needs") and subject to Paliafito's control, (*see* FOF ¶ 22 (Paliafito must give prior written consent regarding any sales, promotion or advertising of the Grip Ball); FOF ¶ 23 (sales representatives retained by Select subject to Paliafito's approval); FOF ¶ 33 (Paliafito retains right of prior approval of trade merchandising techniques)).

Second, Paliafito has introduced overwhelming evidence that Forman was Select Creation's agent for the purpose of selling Grip Ball products. Composto even admits, in an affidavit submitted in conjunction with this summary judgment motion, that "Forman had a fiduciary relationship with Select." Composto June Aff. ¶ 32. Moreover, other evidence clearly demonstrates that Forman and Select had an ongoing relationship whereby Forman acted on Select's behalf, and subject to Select's control, in selling various products, including the Grip Ball, to customers in the Northeast. *See* FOF ¶¶ 34– 36.) It is clear that both Paliafito and Select viewed Forman as a sales representative acting on behalf of Paliafito through Select. *See* FOF ¶ 38 (letter from Paliafito to "Select Sales Force," including Forman); FOF ¶ 39 (Paliafito lists Forman as sales representative for certain Northeast and mid-Atlantic states); FOF ¶ 41 (Paliafito letter to sales

representatives, including Forman, demanding more sales). Indeed, Forman even viewed itself as Paliafito's sales representative, acting on Paliafito's behalf. *See* FOF ¶ 43 (Composto admits Forman represents Paliafito); ¶ 44 (Composto sends letter to customers listing Paliafito as vendor of record); ¶ 53 (Composto letter listing Select–Paliafito as vendor and Forman as sales representative).

Paliafito has also introduced overwhelming evidence that it (sometimes in conjunction with Select) controlled the activities of Forman with respect to the sale of the Grip Ball products. For example, Select and Paliafito prepared a sales kit to be used by Forman and other sales representatives in selling the Grip Ball (FOF ¶ 38); they defined the geographic territories of the sales representatives (FOF ¶¶ 34, 39); Select instructed Forman to list Paliafito and Select as the Grip Ball vendor of record (which Forman subsequently did do) (FOF ¶¶ 36, 44, 46); Paliafito and Select set the prices at which Forman could sell the Grip Ball (FOF ¶¶ 32, 37, 48); Paliafito invoiced ultimate Grip Ball customers (FOF ¶ 32); and Paliafito controlled, and paid for, all Grip Ball advertising (FOF ¶ 39).

■ Composto, as the president of Forman, is an agent of the company. Thus, he is also a subagent of Select and a subagent of Paliafito. *See* Restatement (Second) of Agency § 5, *comment c* ("It is to be noted that when a corporation or partnership is an agent, its officers, employees, and individual partners necessarily act as subagents in the performance of the principal's affairs, since organizations can only act through others.").

The only argument put forth by the defendants in an attempt to overcome Paliafito's affirmative evidence of agency relies upon several New York personal jurisdiction cases. According to the Forman defendants, "[t]he courts in New York are clear: when a person is an independent broker representing many different companies on a commission basis, not subject to their control, there is no agency." Forman and Composto's Answering and Reply Memorandum of Law (Forman Response) at p. 20 (citing *Central School Dist. No. 2, Towns of Horseheads, et al. v. C.R. Evans Corp.*, 49 Misc.2d 924, 268

N.Y.S.2d 800 (N.Y.Sup.1966) and *A. Millner Co. v. Noudar, Lda.*, 24 A.D.2d 326, 266 N.Y.S.2d 289 (N.Y.A.D. 1st Dept.1966)).

■ The defendants' argument fails for several reasons. First, neither of the cited cases has anything whatsoever to do with agency; rather, they both address the question of whether personal jurisdiction could be asserted over an out-of-state defendant through its relationships with representatives in New York under the New York long-arm statute. Second, contrary to Forman's assertion, it is clear, as we have already concluded above, that Paliafito did in fact have the right to control Forman's activities relating to the sale of Grip Ball products. Finally, the question of whether Forman was or was not an independent broker or independent contractor is irrelevant to the agency inquiry. Independent contractors, such as Select Creations and Forman, may be agents as well. *See* Restatement (Second) of Agency § 2(3) (an independent contractor may or may not be an agent). *Accord CBS, Inc. v. Stokely–VanCamp, Inc.*, 522 F.2d 369, 375 n. 14 (2d Cir.1975) ("The usual 'agent,' broker, factor, attorney, is an independent contractor (and not a servant) but also an agent. It is only colloquially that the terms independent contractor and agent are necessarily distinct.") (applying New York law); *Arsand v. City of Franklin*, 83 Wis.2d 40, 48, 264 N.W.2d 579 (Wis.1978) ("An agent may or may not be a servant.").

Therefore, the holdings of *Central School*, 268 N.Y.S.2d at 804–05 (a defendant which employs an *independent distributor* does not do business in the state), and *A. Millner*, 266 N.Y.S.2d at 292 (the physical acts of an agent conducted within the state may not be imputed to a nonresident principal for purposes of personal jurisdiction), are in no way inconsistent with our conclusion that the Forman defendants were the subagents of Paliafito.

■ Having concluded that there is no genuine dispute that both Forman and Composto were the subagents of Paliafito, we must next determine whether Forman and Composto were aware of the fact that Paliafito was their ultimate principal. If the Forman defendants were so aware, they were

subject to the same fiduciary duties imposed upon agents generally. *See* Restatement (Second) of Agency § 428 ("Unless otherwise agreed, a subagent who knows of the existence of the ultimate principal owes him the duties owed by an agent to a principal, except the duties dependent upon the existence of a contract.").

While Forman and Composto deny having any knowledge that Paliafito was the ultimate principal (*see* Composto June Aff. ¶ 32; Affidavit in Support of Composto and Forman's Motion for Summary Judgment and/or Other Relief ¶ 10), the evidentiary record overwhelmingly demonstrates that they did in fact know they were acting on Paliafito's behalf, through Select, in selling the Grip Ball products.

First, Forman and Composto have admitted that they were aware of the Select/Paliafito connection in a brief filed with this Court in connection with this summary judgment motion: "the agreement between Forman and Select was pursuant to the agreement between Paliafito and Select, and pursuant to the authority conferred upon Select by authority conferred upon Select by that agreement." (Forman and Composto Brief in Support of Motion for Summary Judgment at p. 6). Composto has also admitted that Forman provided its sales force to Paliafito. FOF ¶ 43.

Second, Forman was aware of Paliafito's interest in the Grip Ball products even before Paliafito formally purchased the exclusive distribution rights from Joy Lee. Paliafito actually held a sales meeting in *Forman's showroom* and announced its intent to purchase the rights to sell Grip Ball. FOF ¶ 17. At that time, Composto gave Paliafito advice on marketing the product. FOF ¶ 18. The record also clearly reflects that Forman was aware of the fact that Paliafito had purchased the rights to Grip Ball after the purchase was consummated. *See* FOF ¶¶ 38, 39, 41, 54.

Third, communications between Select and Forman clearly indicate that Forman was aware of the fact that it was acting on behalf of Paliafito. On February 26, 1991, Select sent a letter to Forman which sought information from the "Select Creations Sales Force" to help "coordinat[e] *our* relationship with Paliafito." FOF ¶ 34. On March 18, 1991, Select again mailed a letter to Forman (in its capacity as a member of the Select Creations Sales Force) which instructed sales representatives to establish MAI/Paliafito as the vendor of record for the Grip Ball products, FOF ¶ 36, and also instructed Forman to direct buyers approached by other sales representatives to contact Paliafito to confirm that Select and its representatives were the only authorized representatives to sell Grip Ball. FOF ¶ 37.

Finally, communications directly between Paliafito and Forman clearly show that Forman was aware that it was acting on Paliafito's behalf. For example,

- Paliafito sent Forman a sales kit for the sale of Grip Ball products and a list of house accounts and territories, (FOF ¶¶ 38, 39);

- Paliafito sent a letter to Paliafito's sales representatives (including Forman) urging its sales force to generate more orders, (FOF ¶ 41);

- Forman attended Paliafito's national sales meeting on August 3, 1991, (FOF ¶¶ 68, 69);

- Paliafito shipped and invoiced all Grip Ball products sold by Forman (FOF ¶ 32); and

- Paliafito paid Forman's commissions for Grip Ball sales, (FOF ¶¶ 57, 59, 74–76, 81, 91).

Accordingly, because the Court concludes that there is no genuine factual dispute that Forman and Composto were the subagents of Paliafito and were aware that they were acting on behalf of Paliafito with respect to the sale of the Grip Ball products, it concludes that the Forman defendants owed fiduciary duties to Paliafito.

### 2. Did the Forman Defendants Breach Their Fiduciary Duty to Paliafito?

 The fiduciary duty owed by an agent to a principal includes the duty of undivided loyalty. *See* Restatement (Second) of Agency § 387 ("[A]n agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters con-

nected with his agency.") *See also Bocke-muhl v. Jordan,* 270 Wis. 14, 18, 70 N.W.2d 26 (Wis.1955) ("Absolute fidelity and loyalty to the interests of his principal is the first duty and the highest obligation of an agent.") (quoting *Weinhagen v. Hayes,* 174 Wis. 233, 243, 178 N.W. 780 (Wis.1920)); *TPL Associates v. Helmsley–Spear, Inc.,* 146 A.D.2d 468, 536 N.Y.S.2d 754, 756 (N.Y.A.D. 1st Dept. 1989) ("An agent is charged with a duty of loyalty and may not have interests in the subject of the transaction which are adverse to those of his principal."). Moreover, agents are prohibited from taking any action in competition with their principal or adverse to their principal's interests. *See* Restatement (Second) of Agency § 393, *comment b* ("In the usual case, it is the agent's duty to further his principal's interests even at the expense of his own in matters connected with the agency. Thus, an agent to buy or to sell for the principal must not buy or sell in competition with the principal.").

▮▮▮▮ Much like the question of the existence of an agency relationship, the question of whether a fiduciary duty has been breached is ordinarily one for the ultimate factfinder. *See Gordon v. Muchnick,* 180 A.D.2d 715, 579 N.Y.S.2d 745, 746 (N.Y.A.D. 2nd Dept.1992) ("Once a duty is found to exist, the question of whether the defendant breached that duty is generally a question of fact for the jury."); *Peck v. Meda–Care Ambulance Corp.,* 156 Wis.2d 662, 674, 457 N.W.2d 538 (Wis.App.1990) (whether lawyer breached duty to client is a question of fact), *review denied,* 458 N.W.2d 533 (Wis.1990). Thus, absent circumstances where the non-movant fails to introduce any evidence from which a reasonable jury could find in its favor, summary judgment will be denied. However, because the Forman defendants have failed to introduce evidence from which a reasonable jury could reach any conclusion other than that they breached their duty of loyalty to Paliafito, the Court concludes, as a matter of law, that the Forman defendants did in fact breach their fiduciary duties to Paliafito.

The Forman defendants breaches of fiduciary duty include the following:

• Composto and Joy Lee met with a representative of Toys R Us without Paliafito's knowledge or consent. At that meeting, Joy Lee offered to sell Grip Ball products directly to Toys R Us (bypassing Paliafito completely) at a price lower than that charged by Paliafito. FOF ¶ 83.

• Forman failed to inform Paliafito that Select was contacting Joy Lee directly in August of 1991, beginning to discuss bypassing Paliafito. FOF ¶¶ 77–80.

• On October 7, 1991, Forman and Composto participated in a Grip Ball sales meeting organized by Joy Lee. FOF ¶¶ 93, 94. Paliafito was excluded from this meeting. FOF ¶ 95. Moreover, neither Forman nor Composto informed Paliafito of this meeting. FOF ¶ 104.

• Joy Lee promised Composto that she would pay all commissions owed by Paliafito to Forman. FOF ¶ 102.

• Joy Lee instructed sales representatives to have their accounts switch vendor numbers from Paliafito to MAI. FOF ¶ 98. Forman did so. FOF ¶ 112.

• Forman and Composto delivered Grip Ball orders from their customers to MAI rather than to their principal, Paliafito. FOF ¶¶ 112, 116–18.

All of these dealings were adverse to Paliafito's interests. The Forman defendants' participation in, and failure to disclose, these activities constitutes a breach of their fiduciary duties as a matter of law.

▮▮▮ In an attempt to excuse these breaches, Forman makes several rather lame arguments (without citing *any* legal authority in support thereof). Many of these arguments again attempt to challenge the existence of an agency relationship and/or a duty of loyalty between the Forman defendants and Paliafito. Only two warrant comment. First, the Forman defendants claim that MAI terminated Paliafito's exclusive distribution rights on July 12, 1991, and that therefore they cannot be held liable for breaching their fiduciary duties because these duties ceased when Paliafito's relationship with MAI was terminated. This argument fails because MAI did not permanently

terminate Paliafito's distribution rights on July 12, 1991. *See Select Creations,* 828 F.Supp. at 1335–36. Moreover, and perhaps more importantly, Forman's duties to Paliafito were independent of any relationship between Paliafito and MAI. Forman's duty of loyalty continued as long as the agency relationship continued, and Forman has presented no evidence which would indicate that its agency relationship with Paliafito was ever terminated. In fact, Forman continued to regularly communicate with Paliafito throughout October of 1991, and accepted commission payments from Paliafito as late as October 17, 1991. FOF ¶ 110.

The Forman defendants also argue that they should be excused from liability because they owed an independent fiduciary duty to their immediate principal, Select. According to the defendants, if they had disclosed the various machinations surrounding MAI's termination of Paliafito—in which Select was a major participant—they would have violated their duty of loyalty to Select. This argument, however, also fails. Under the Restatement,

> The subagent is subject to a duty ... not to act contrary to what he knows to be the principal's orders. Although he has a duty of loyalty and obedience to the agent who is his immediate principal, the subagent is subject to liability to the ultimate principal for participating in a breach of duty by the agent to the principal if he has notice that the agent's conduct constitutes a breach of duty.

Restatement (Second) of Agency § 428, *comment b.* The Forman defendants clearly were on notice that Select's direct dealings with MAI violated its fiduciary duties to Paliafito; the fact that Forman concealed the activities in question from Paliafito clearly supports the conclusion that they were aware of the breach.

**3. Damages Resulting From Breach.**

Paliafito has not asked for a specific amount of damages in this motion; rather, it requests a declaration of liability only. Although the Court need not determine the amount of damages suffered by Paliafito, because damages are a necessary element of liability, the Court must determine whether Paliafito has suffered some injury in order for liability to attach.

Under the applicable law in both Wisconsin and New York, injury is presumed from the mere fact of a breach of fiduciary duty. According to the Wisconsin Supreme Court, "the principal does not have to show ... damage. He only has to show a failure of full disclosure on the part of the agent.... In the absence of full disclosure of the facts to a principal he can refuse to pay the commission or recover commission already paid." *Bockemuhl,* 270 Wis. at 18–19, 70 N.W.2d 26 (quoting *Faultersack v. Clintonville Sales Corp.* 253 Wis. 432, 437, 34 N.W.2d 682 (Wis. 1948) (internal citations and quotations omitted). *See also Soam Corp. v. Trane Co.,* 202 A.D.2d 162, 608 N.Y.S.2d 177, 178 (N.Y.A.D. 1st Dept.1994) ("An agent is held to the utmost good faith in his dealings with his principal, and forfeits any right to compensation for his services if he acts adversely to his employer in any part of the transaction.") (quotation omitted), *leave to appeal denied,* 83 N.Y.2d 758, 615 N.Y.S.2d 875, 639 N.E.2d 416 (1994); *Hartford Elevator, Inc. v. Lauer,* 94 Wis.2d 571, 580, 289 N.W.2d 280 (Wis. 1980) ("The general rule appears to be that an agent who is dishonest in the performance of his duties forfeits the right to compensation."). The recovery of past compensation is, however, limited by the doctrine of unjust enrichment. *See Hartford Elevator,* 94 Wis.2d at 586a, 289 N.W.2d 280.

Based on the entire evidentiary record now before us, we conclude that Paliafito was indeed harmed by the Forman defendants' breach of their fiduciary duty to Paliafito. The mere breach itself, under the laws of both Wisconsin and New York, creates a presumption of damages sufficient to permit liability to attach. Since Paliafito has moved only for a declaration of liability in this motion for partial summary judgment, the Court need not determine the scope or amount of damages herein. Moreover, because the extent of damages is rife with factual disputes, the scope and quantity of damages should be decided by the trier-of-fact.

### 4. Conclusion.

Based on the foregoing reasoning, the Court concludes (1) that the Forman defendants were subagents of Paliafito, (2) that they therefore owed fiduciary duties to Paliafito, (3) that the Forman defendants breached those fiduciary duties, and (4) that Paliafito suffered harm as a result. Accordingly, Paliafito's motion for partial summary judgment on the liability question will be granted. Naturally, this conclusion necessitates the denial of the Forman defendants' motion for summary judgment dismissing this claim.

### B. Tortious Interference.

■ As a preliminary matter, this Court must determine whether Wisconsin or New York law governs Paliafito's claim for tortious interference with contract or prospective economic advantage. Because "both New York and Wisconsin have adopted a [tortious interference] cause of action similar to that described by § 766A (although not § 766A itself), there is no conflict of laws" between these states. *Railway Exp. Agency v. Super Scale Models, Ltd.*, 934 F.2d 135, 139 (7th Cir.1991). "Where the law of the two states is essentially the same, we apply the law of the forum state." *International Administrators, Inc. v. Life Ins. Co. of North America*, 753 F.2d 1373, 1376 n. 4 (7th Cir. 1985). Therefore, because Wisconsin is the forum state in this action, the Court will apply Wisconsin law to this claim.

■ Wisconsin law "protects legitimate competition from predatory tactics by subjecting anyone who wrongfully interferes with existing or prospective contractual relations to liability." *Pure Milk Products Cooperative v. National Farmers Organization*, 90 Wis.2d 781, 796, 280 N.W.2d 691 (Wis. 1979). *See also Cudd v. Crownhart*, 122 Wis.2d 656, 659, 364 N.W.2d 158 (Wis.App. 1985) ("A Wisconsin plaintiff therefore has a remedy in a common law action for interference with existing contractual relations and for tortious interference with prospective contractual relations.") (citation omitted), *review denied*, 122 Wis.2d 783, 367 N.W.2d 223 (Wis.1985).

■ A Wisconsin tortious interference cause of action has five elements: (1) the plaintiff must have had a contract or a prospective contractual relationship with a third party; (2) the defendant must have interfered with that relationship; (3) the interference by the defendant must have been intentional; (4) there must be a causal connection between the interference and damages; and (5) the defendant must not have been justified or privileged to interfere. *Duct–O–Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir.1994) (applying Wisconsin law and citing *Bersch & Co. v. Dairyland Greyhound Park, Inc.*, 1994 WL 185996 at *9, (Wis.App.1994), *review denied*, 525 N.W.2d 732 (Wis.1994). *See also Cudd*, 122 Wis.2d at 659–660, 364 N.W.2d 158; *Lorenz v. Dreske*, 62 Wis.2d 273, 214 N.W.2d 753 (1974); Wis JI Civil–2780 (Intentional Interference with Contractual Relationship).

### 1. Was There a Contract or Prospective Economic Relationship?

■ The plaintiff offers documented proof of both existing and prospective contracts with a third party, Toys R Us, in the form of purchase orders for Grip Ball products. FOF ¶¶ 113, 116. Because Toys R Us considered purchase orders to be binding contracts between the named parties, and because the October 31st Toys R Us purchase order listed Paliafito's vendor number, this purchase order constituted an existing contract between Paliafito and Toys R Us. *Id.* Moreover, it is clear that Paliafito had a sufficiently certain, concrete and definite prospective relationship with Toys R Us with respect to the sale of Grip Ball products. *See Sampson Investments v. Jondex Corp.*, 176 Wis.2d 55, 73, 499 N.W.2d 177 (Wis. 1993). Paliafito owned the exclusive right to distribute Grip Ball products, and Toys R Us continued to purchase these products from 1991 to 1993. FOF ¶ 118. Had the economic relationship between Paliafito and Toys R Us not been interfered with, Paliafito may well have continued to supply Grip Ball products to Toys R Us.

■ In response to this evidence, Forman argues that "Paliafito simply had no customers, that all customers were Forman's

customers, and that, simply stated, there could not have been any inducement to any Paliafito customers to breach their contract, and that Paliafito's prospective economic advantage had nothing to do with any customers of Forman's." Forman and Composto's Response at 14. The defendants go on to say that "there was nothing whatsoever to show any open purchase order from Toys R Us, or any Toys R Us order, which had been cancelled." *Id.* at 15. We reject these arguments for the following reasons. First, Forman was acting as an agent of Paliafito, (*see* § III.A., *supra.*); therefore all of Forman's clients in regard to the Grip Ball were Paliafito's clients. Moreover, contracts (in the form of purchase orders) had existed between Paliafito and Toys R Us in the past, did exist at the time in question (for example, the October 31st purchase order made out to Paliafito but filled by MAI), and were likely to exist in the future (because Paliafito was supposed to be the exclusive U.S. distributor of Grip Ball).

Accordingly, the Court concludes that no reasonable jury could fail to conclude that Paliafito had an existing and sufficiently certain prospective relationship with Toys R Us. This first element of the cause of action has been clearly satisfied.

### 2. Did the Forman Defendants Interfere with this Relationship?

■ The Wisconsin tortious interference jury instruction states that "[a]n interference may consist of *any conduct or words conveying to [the third party] the defendant's desire to influence [the third party] to refrain from dealing with the plaintiff.* ... It does not require ill will or expression of malice towards the plaintiff." Wis JI Civil–2780 (emphasis added).

On October 23, 1991, Composto instructed Toys R Us as follows: to cancel any open purchase orders issued under Paliafito's vendor number, to reissue replacement orders under the MAI vendor number, and to issue all future Grip Ball orders to the MAI vendor code. FOF ¶ 112. This action indicated to Toys R Us a desire to keep it from including Paliafito in the order-filling process, and thereby to keep it from dealing with Paliafi-

to. This letter irrefutably indicates "the defendants' desire to influence [the third party] to refrain from dealing with the plaintiff." Wis JI Civil–2780. Moreover, Forman directly interfered with an existing contract when it redirected the October 31st Toys R Us purchase order to MAI, even though the order listed Paliafito's vendor code. FOF ¶¶ 116, 117.

By documenting these specific instances of interference, Paliafito has established, beyond doubt, that the defendants interfered with its relationship with Toys R Us. Accordingly, the Court concludes that no reasonable jury could conclude otherwise.

### 3. Was the Interference Intentional?

■ The Wisconsin tortious interference jury instruction states that "it is reasonable to infer that a person intends the natural and probable consequences of [his or her] acts. Although other reasons may appear, [the plaintiff] must prove that [the defendants'] prime purpose was to interfere with the contractual relationship [the plaintiff] had with [the third party] or [that the defendants] knew or should have known that such interference was substantially certain to occur as a result of the conduct." Wis JI Civil–2780. *See also Pachucki v. Republic Ins. Co.*, 89 Wis.2d 703, 710, 278 N.W.2d 898 (Wis.1979) ("[T]o constitute an intentional tort, however, the actor must intend the consequences of his acts, or believe that they are substantially certain to follow.") (quoting Restatement (Second) of Torts § 8A).

The defendants do not attempt to dispute that their conduct was intentional. Indeed, it would be difficult to argue that diverting the Toys R Us orders was an accident or that they did not intend the resulting consequences. Paliafito has established that the defendants' interference was intentional through the October 23rd letter from Composto to Toys R Us instructing Mr. Stack to cancel any open purchase orders, reissue them under MAI's vender code, and use the MAI code in future orders. FOF ¶ 112. Moreover, Composto's deliberate action in diverting the October 31st order to MAI further evidences intentional interference.

FOF ¶¶ 117, 118. These examples satisfy the criteria advanced for "intent."

The Court must infer that the defendants intended for Toys R Us to cease dealing with Paliafito, and that such cessation was a natural and probable consequence of the defendants' communications with Toys R Us. Likewise, we find that by sending the letter to Toys R Us and redirecting the October 31st purchase order to MAI, the defendants' "prime purpose was to interfere with the contractual relationship [plaintiff] had with [the third party]," Toys R Us. Wis JI Civil-2780. Finally, that the defendants "knew or should have know that such interference was substantially certain to occur as a result of the conduct" is obvious because, as the sales representative for Toys R Us, it was foreseeable and "substantially certain" that Toys R Us would direct their purchase orders to the entity which the defendants instructed.

Therefore, the Court concludes that there is no genuine factual dispute that this element is satisfied.

### 4. Causation and Damages.

■ In order to show a causal link between the actions of the defendant and the damages sustained, Paliafito must show that "the defendant[s'] conduct was a substantial factor; that is, it had a substantial influence in producing the damages claimed by the plaintiff." Wis JI Civil–2780. *See also Fischer v. Ganju,* 168 Wis.2d 834, 857, 485 N.W.2d 10 (Wis.1992); *Ehlinger v. Sipes,* 155 Wis.2d 1, 12, 454 N.W.2d 754 (Wis.1990). "The phrase 'substantial factor' denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense." *Clark v. Leisure Vehicles, Inc.,* 96 Wis.2d 607, 617–18, 292 N.W.2d 630 (Wis.1980).

■ Paliafito asserts two separate claims of damages under its tortious interference theory: (1) those arising out of the cancellation of the October 31, 1991 Toys R Us order for $391,528 which listed Paliafito as vendor

of record, (FOF ¶ 116); and (2) those arising from subsequent purchase orders placed under MAI's vendor code at Composto's direction (for $1,285,553), (FOF ¶ 118). The Court views this first claim for damages as arising from interference with an existing contractual relationship between Paliafito and Toys R Us; it views the second claim for damages as arising from interference with the prospective economic relationship.

That the defendants' conduct was a substantial factor in causing damage to Paliafito with respect to the diversion of the October 31st order is clear. Paliafito was the vendor of record; it had an existing, ongoing relationship with Toys R Us. On October 31st, Toys R Us placed an order to purchase Grip Ball products. (FOF ¶ 116.) At the direction of the Forman defendants, this order was redirected from Paliafito to MAI. (FOF ¶¶ 112, 117.) Clearly, Paliafito suffered monetary damages as a result of the defendants' interference—it was prevented from making whatever its normal and customary profit would have been on a $391,528 order.[6]

■ With respect to Paliafito's claims for damages resulting from the Forman defendants' interference with its prospective economic relationship with Toys R Us, the Court concludes that Paliafito has failed to establish an absence of genuine factual dispute that the conduct of the Forman defendants was a substantial factor in causing it damages. While it is true that as the exclusive distributor of Grip Ball, Paliafito probably lost money from the diverted contracts with Toys R Us, it is not at all clear that MAI would not have terminated Paliafito's exclusive distributorship at some point between 1991 and 1993, even absent the defendants' involvement. Given the lack of evidence on this issue, summary judgment is inappropriate.

Accordingly, the Court concludes that the plaintiff has clearly established causation and damages with respect to the October 31, 1991 Toys R Us order. However, the Court finds that there is a genuine factual dispute as to whether the defendants' interference caused the future damages claimed by the plaintiff.

---

**6.** The Court makes no attempt to determine the amount of damages suffered by Paliafito. For the purposes of this motion for partial summary judgment, we need only determine that damages were in fact incurred in order to impose liability on the Forman defendants.

## 5. Privilege or Justification?

 "Today it is generally agreed that an intentional interference with the existing contractual relations of another is prima facie sufficient for liability, and that the burden of proving that it is 'justified' rests upon the defendant." *Chrysler Corp. v. Lakeshore Commercial Finance Corp.*, 389 F.Supp. 1216, 1221 (E.D.Wis.1975), *aff'd*, 549 F.2d 804 (7th Cir.1977) (quoting W. Prosser, *Law of Torts* 967, sec. 123 (3d ed. 1964). *See also Federal Pants, Inc. v. Stocking*, 762 F.2d 561, 569 (7th Cir.1985) ("Once the plaintiff has proved intentional interference with existing contractual relations, the burden of proving the justification for such interference is upon the defendant.") (citing *Chrysler Corp.* 389 F.Supp. at 1221). Thus, the *defendants* must show "by greater weight of the credible evidence" that justification or privilege exists for the interfering actions. Wis JI Civil–2780. The defendants here offer no evidence that either justification or privilege exists. Although it is not the Court's duty to present arguments for a party, in the interest of justice, the Court will attempt to determine whether there is any conceivable way the defendants mights prove privilege or justification.

 First, the Court concludes that no recognized privilege exists under the facts here present. Although "[t]his branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege," Restatement (Second) of Torts, Second § 767, *comment a*, several accepted defenses have been identified by the Restatement. These include: competition (§ 768), financial interest in the business of the person induced (§ 769), responsibility for the welfare of the third person (§ 770), inducement in order to influence the business policy if the actor has an economic interest at stake (§ 771), disclosure of truthful information or advice that induces forbearance (§ 772), and assertion of a bona fide claim which causes nonperformance (§ 773). Restatement (Second) of Torts §§ 768–773. Other identified privileges include: protection of a public interest, protection of a contractual right with no malice intended toward the plaintiff, assertion of an absolute privilege, actions taken with the purpose of bettering the defendant's own business without intent to destroy the other's business, actions taken in good faith, and actions by or in behalf of an organization. 45 Am.Jur.2d, *Interference* §§ 23, 28, 29, 35.

None of these privileges apply to the defendants, however. The defendants were not in competition with the plaintiff, had no financial interest in Toys R Us, were not responsible for the welfare of Toys R Us, were not attempting to influence the business policy of Toys R Us, did not induce the breach due to disclosure of truthful information or advice, were not asserting a bona fide claim, were not advancing any contractual right, were not exercising an absolute right to change the distributor (or any other absolute right), were not acting to better their own business without intending to destroy Paliafito's, were not acting in good faith, and were not acting on behalf of a corporation exclusive of their own designs. Thus, none of the identified privileges exist.

 Having found no privilege, the Court will turn to justification. "A defendant's conduct may only be found justified if the means employed by the defendant were lawful." Wis JI Civil– 2780. "Lawful" is defined by Black's Law Dictionary as "warranted or authorized by the law ... not contrary to nor forbidden by the law." It is distinguished from "legal" in part by an ethical, moral quality inherent in "lawful" but absent in "legal." "Legal" involves technical adherence to the law whereas "lawful" embodies social mores as well. *Black's Law Dictionary* pp. 885–886 (6th ed. 1990). In intentionally interfering with the relationship between Paliafito and Toys R Us, the defendants breached their fiduciary duties to the plaintiff (*see* § III.A.2., *supra*), and by doing so violated the standard of business conduct deemed appropriate by society. The behavior described in findings of fact 77–80, 83, 93–104, 112, and 116–118 clearly constitutes sharp business practices (not to mention a breaches of fiduciary duty), and is not warranted or authorized by the law. The Forman defendants' conduct therefore was unlawful, and thus not justified.

The defendants have failed to introduce any evidence which would entitle them to a jury determination on this element. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54. Moreover, the Court, after careful analysis, giving the defendants every benefit of implication, cannot find a justification or privilege for the defendants' actions. Therefore, the plaintiff prevails on this final element.

### 6. Conclusion.

Based on the foregoing analysis, the Court concludes that Paliafito has established that there is no genuine factual dispute that (1) both a current contractual relationship and a prospective economic relationship existed between it and Toys R Us, (2) the defendants interfered with that relationship by re-directing orders to MAI and by instructing that future orders be issued with MAI's vendor code, (3) the defendants' interference was intentional, and (4) a causal connection exists between Composto's interference and the damages sought with respect to the existing contractual relationship. Paliafito prevails on the fifth element because the defendants failed to introduce any evidence that their interference was justified or privileged. Accordingly, Paliafito's motion for partial summary judgment declaring the Forman defendants liable on the tortious interference claim will be granted to the extent that it involves interference with an existing contractual relationship. Forman's cross-motion seeking dismissal of this claim will therefore be denied.

There is, however, a genuine factual dispute regarding the causation and damages element in Paliafito's claim for damages resulting from the defendants' interference with its prospective economic relationships. Therefore, both party's summary judgment motions will be denied in this respect. This issue, as well as the actual amount of damages must be decided by the trier-of-fact in future proceedings.

### C. FORMAN'S COUNTERCLAIM.

■ Forman has asserted a counterclaim against Paliafito for some $200,000 in commissions allegedly due and owing. It has filed a motion for summary judgment asking for a declaration of liability; Paliafito has filed a cross-motion for summary judgment asking the Court to dismiss Forman's counterclaim.

■ Because Forman breached its fiduciary duties to Paliafito, *see* § III.A., *supra,* it has forfeited any right it may have had to recover these commissions. *See Bockemuhl,* 270 Wis. at 18–19, 70 N.W.2d 26; *Soam Corp.,* 608 N.Y.S.2d at 178. Moreover, because Forman did not have a contractual relationship with Paliafito—its contract was with Select to sell Grip Ball product on Paliafito's behalf—it cannot attempt to recover any commissions that might be due directly from Paliafito. *See* FOF ¶ 122. The Restatement states that "[t]he authorized employment of . . . a subagent does not thereby subject the principal to contractual liability." Restatement (Second) of Agency § 458. The comment to this section of the Restatement elaborates on this principle:

> If an agent employs a subagent, the agent is the employing person, and the principal is not a party to the contract of employment, except where, by express promise or otherwise, he becomes a surety. He is not, therefore, subject to pay the agreed compensation, nor is he subject to contractual liability to indemnify the subagent, to maintain friendly relations with him, or to keep accounts.

*Id., comment a.* Thus, any contractual right Forman may have to recover any commissions owed is a claim against Select, not Paliafito.

■ Forman may have equitable grounds to recover a portion of the commissions allegedly due from Paliafito under a theory of quantum meruit or unjust enrichment. It has not asserted these legal theories in this motion, however. Moreover, the extent that Forman is entitled to compensation for the reasonable value of services rendered or because Paliafito received undeserved benefits from Forman can be sorted out in the damages phase of this litigation. Forman may assert these equitable theories in an attempt to limit the damages recoverable by Paliafito

on its breach of fiduciary duty and tortious interference causes of action.

### IV. *SUMMARY AND ORDER*

Based upon the foregoing reasoning, the Court finds that there is no genuine, material dispute of fact that Forman and Composto breached their fiduciary duties to Paliafito. Accordingly, Paliafito's partial summary judgment motion seeking a declaration of liability is hereby **GRANTED** and the Forman defendants' corresponding motion for summary judgment dismissing this claim is **DENIED**. However, the Court concludes that there is a genuine factual dispute regarding the extent of Paliafito's damages which should be resolved by the ultimate trier-of-fact in this case.

The Court further concludes that no reasonable jury could return a verdict for the Forman defendants on Paliafito's tortious interference claim with respect to its existing contractual relationship with Toys R Us. Accordingly, Paliafito's motion for partial summary judgment is hereby **GRANTED** in this respect. The Forman defendants' corresponding motion for summary judgment dismissing this claim is **DENIED**. Because factual disputes remain regarding the causation and damages element in Paliafito's claim for tortious interference with its prospective economic relationships, both parties' summary judgment motions are hereby **DENIED** in this respect. This issue, as well as the actual amount of damages, shall be decided by the trier-of-fact in future proceedings.

Finally, the Court concludes that, because Forman breached its fiduciary duties to Paliafito and because it has no contractual relationship with Paliafito, it is not entitled to recover any commissions allegedly due from Paliafito. Accordingly, Paliafito's summary judgment motion seeking dismissal of the counterclaim is hereby **GRANTED** and Forman's motion for summary judgment on this claim is **DENIED**.

Counsel for both parties shall each submit a letter brief to the Court proposing a procedure and schedule for disposing of the remaining issues in this case by January 8, 1996. Each party will be permitted to respond to the opposing party's brief by January 15, 1996. Upon the completion of this briefing schedule, the Court will issue a scheduling and case management order forthwith.

**SO ORDERED.**